**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Raymond Shorter,

Plaintiff,

v.

St. Cloud State University,

Defendant.

Civil No. 00-1314 RHK/RLE

**MEMORANDUM OPINION AND ORDER**

---

Leslie L. Lienemann, Lienemann Law Office, Bloomington, Minnesota, for Plaintiff.

Nancy J. Joyer and Scott R. Goings, Assistant Attorney Generals, Saint Paul, Minnesota, for Defendant.

---

## Introduction

Plaintiff Raymond Shorter ("Shorter"), an African-American, was a graduate student in the Applied Psychology Department at Defendant St. Cloud State University ("SCSU"), a Minnesota State University. Soon after Shorter enrolled in SCSU's graduate program, he began raising concerns about the curriculum–specifically, that it was devoid of any multicultural materials. Shorter contends that immediately after he voiced his concerns about the curriculum, some of the professors and students in the Applied Psychology Department began a course of discrimination and retaliation against him–thereby subjecting him to a hostile educational environment. Shorter further asserts that SCSU was aware of the harassment and did nothing to curtail it. SCSU denies that Shorter was subjected to a hostile educational environment because of his race, that it

FILED AUG 14 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD AUG 14 2001
DEPUTY CLERK ______

tolerated any alleged harassment, or that it retaliated against Shorter for complaining.

Shorter brought this suit alleging that SCSU discriminated against him based on his race and created a hostile educational environment in violation of 42 U.S.C. § 2000d ("Title VI"). Currently before the Court is SCSU's Motion for Summary Judgment. For the reasons stated below, the Court will grant the motion.

**Background**

Shorter graduated from SCSU in 1995 with a bachelor's degree in applied psychology. (Lienemann Aff. Ex. 54 (Shorter Dep. at 1007-8) (hereinafter "Shorter Dep.").) Shorter then enrolled in a graduate program in Human Relations at the University of Minnesota. (Id. at 1009.) He attended the University from the fall of 1995 until December 1997, when he moved to Virginia. (Id. at 1008.) While in Virginia, Shorter worked as a counselor for the Virginia prison system. (Doc. No. 39 (Records Certification Commonwealth of Virginia).) In February 1998, after less than one month of employment with the Virginia prison system, Shorter was terminated as being "unsuitable" for work as a prison counselor.[1] (Id. at 1 (Letter of Termination).)

After his termination, Shorter began looking for a job and place to live in Minnesota. (Shorter Dep. at 1010.) Shorter contacted SCSU's then president, Bruce

---

[1] Shorter filed a discrimination complaint against the Virginia Department of Corrections alleging that he had been terminated because of his race. (Doc. No. 39 (Records at 1).) The Office of Equal Employment Services, after a complete investigation into Shorter's allegations, determined that there was insufficient evidence to support a finding of race discrimination and dismissed his complaint. (Id.)

Grube ("Grube"), with whom he had developed a relationship while attending SCSU as an undergraduate student, and inquired about a position on SCSU's staff. (Id. at 1010-12.) Shorter accepted a position with SCSU as an independent contractor to advise SCSU on issues of multiculturalism. (Shorter Dep. at 1013; McKay Aff. at ¶ 3.) Shorter was also given permission to live in SCSU's student housing from May to August 1998, even though he was not enrolled as a student at the time. (Shorter Dep. at 1016.) SCSU did not charge Shorter for his first few weeks of housing. (Id. at 1015.)

## I. Shorter's First Semester as a Graduate Student in SCSU's Applied Psychology Department

In June, Shorter applied for admission into SCSU's graduate program in applied psychology. (Id. at 1018.) Despite receiving Shorter's application after the deadline for admissions for the 1998-1999 school year, SCSU admitted Shorter into the program and he began taking classes on August 24, 1998. (Shorter Dep. at 1018; Nunes Aff. ¶ 5.) Classes in the applied psychology graduate program met once a week. (McKay Aff. ¶ 5.) On September 9, 1998, after two weeks of classes, Shorter wrote a memorandum addressed to Avelino Mills-Novoa ("Mills-Novoa"), Chair of the Applied Psychology Department, and Niloufer Merchant ("Merchant"), Graduate Program Coordinator, and copied to Joane McKay ("Dean McKay"), Dean of the College of Education, Suzanne Williams ("Williams"), Vice President, and Grube. (Lienemann Aff. Ex. 1.) In this memorandum, Shorter expressed his concerns that the curriculum being taught in his

classes was focused on how to provide therapy to white clients only, and that he felt the burden had been placed upon him to teach white students about his culture.[2] (Id.) After writing this letter, Shorter was approached by Mills-Novoa and Merchant separately to discuss his concerns. (Shorter Dep. at 1034-35.) According to Shorter, Merchant informed him that "there [are] concerns within the department in terms of dealing with multicultural counseling as an emphasis, because they are working on it in terms of dealing with trying to get the accreditation and the department as a whole is trying to incorporate it." (Shorter Dep. at 1035.) Also during this time, SCSU hired Shorter as an advisor in its Office of Multicultural Affairs. (McKay Aff. ¶ 6.)

On September 22, 1998, less than a month after beginning his graduate work, Shorter wrote another memorandum addressed to Merchant and copied to Mills-Novoa, Dean McKay, Williams, Grube, and Shahzad Ahmad, Director of Minority Student Programs. (Lienemann Aff. Ex. 2.) This memorandum, titled "Racism within the Applied Psychology Department," contained the following statement:

> I am experiencing a tremendous amount of pain and frustration within the classroom settings in the Applied Psychology Department. I strongly believe that the environment is extremely hostile and that I am being viewed as a nonexistent, inferior being. I strongly believe that I am being brainwashed to believe that I must strip myself of my rich cultural heritage and conform to the evil thoughts and practices of White Supremacy. I strongly believe that I am being forced to commit cultural genocide and suicide on myself and my peoples. I strongly believe that I am being forced to vigorously strip away my

---

[2] Shorter was one of four students of color in the graduate applied psychology program at SCSU. (Lienemann Aff. Ex. 58 (Lesar Dep. at 64).)

> soul. Whenever I enter into any of my classroom settings, my spirit becomes very drained, frozen in a manic depressive state. I, too, hurt from the feeling of being forced to think that I am a subhuman creature from an unknown world.

(Id.)

On September 25, 1998, in response to Shorter's memoranda, the counseling psychology faculty met for more than seven hours to discuss the concerns raised by Shorter. (Peterson Aff. at ¶ 3.) Among the issues discussed at the meeting were the need to (1) address issues of racism in the classroom, (2) have an ongoing dialogue among faculty, and between faculty and students, (3) document what the faculty wants to do to address the issues, (4) be more open with students about these issues in the classroom, (5) have more training, particularly with incorporating materials into the classroom, and (6) increase the number of students of color in the classroom. (Peterson Aff. Ex. A (Minutes: Counseling Psychology Meeting).) The faculty also resolved to implement the following "action plans": Mills-Novoa would draft a letter to Shorter and distribute it to the faculty; other faculty members would draft a letter to be distributed to the students; and others would meet to develop a proposal on implementing multicultural discussion groups. (Id.) The faculty also raised questions of whether Shorter's concerns could be made a priority, whether they would be able to sustain the "commitment," and whether it would be seen as credible if the white faculty members were to take a leadership role. (Id.) Another

faculty meeting was scheduled for October 2, 1998, to, inter alia, "follow up on multicultural issues." (Id.)

On October 5, 1998, the faculty, following up on the above action plan, responded to Shorter via a letter signed by all applied psychology faculty members. (Lienemann Aff. Ex. 3.) The letter acknowledged that the faculty "hear[s] the pain and anger triggered by your experiences as a student in the Department of Applied Psychology . . . [and] your letter communicates a sense of invalidation and a loss of identity. [The faculty] want[s] you to know that we are taking your feelings seriously." (Id.) The faculty proposed in the letter that, as a starting point, they would try to create an environment that allows the students to talk openly about racism in their classrooms and that they would sponsor seminars where issues of racism could be discussed. (Id.) The faculty also sent a memorandum to all counseling psychology graduate students regarding the importance of having a safe, respectful, and nondiscriminatory classroom environment. (Shorter Dep. Ex. 7.)

Shorter responded to the letter from the faculty by sending a "letter to the editor," via e-mail, to SCSU's campus newspaper, the Chronicle. (Lienemann Aff. Ex. 60 (letter to the editor dated October 16, 1998).) The e-mail, titled "Attempted Murder in the Applied Psychology Department!! Will They Complete Their Mission," accused SCSU of "trying to murder [his] mind and spirit," "forcefully inject[ing him] with the deadly disease called White Supremacy," and "trying to lynch [him]." (Id.) Shorter also accused

the faculty of telling him that the white perspective is more important than the perspectives of people of color. (Id.) He ended his e-mail with the statement "Please stop trying to KILL ME." (Id.) In addition to having the e-mail published in the Chronicle, Shorter sent it to numerous other people and organizations.[3] (Shorter Dep. Ex. 5.)

On October 23, 1998, Shorter wrote another e-mail to the applied psychology faculty. (Shorter Dep. Ex. 8.) This e-mail was titled "Your Insulting letter," referencing the faculty's October 5 letter to Shorter. (Id.) Shorter found the faculty's letter to be insulting, rude, disrespectful, and racist. (Id.) He accused the faculty of hate crimes and white supremacy, and suggested that the faculty inform people of color that "they are not welcome within the Applied Psychology Department because they are inferior beings . . . if they enter the department, that [the faculty] will make sure that they experience a torching and brutal murder of their mind, body, and soul . . . [and that the faculty] are only going to produce more racists, White educators." (Id.) This letter was also copied to the entire SCSU faculty, some professional psychology associations, and numerous civil rights groups. (Id.)

---

[3] Shorter copied the faculty and administration at SCSU as well as the Council of African American Students, Movimiento Estudiantil Chicano de Aztlan, American Indian Movement, American Indian Student Association, Hmong Student Association, African Students Association, American Counseling Association, American Psychological Association, National Black Psychology Association, Council of Black Minnesotans, and Nation of Islam. (Lienemann Aff. Ex. 60; Shorter Dep. at 2061-72.) SCSU states that the e-mail was also sent to the Star Tribune and the Associated Press. (Def's Mem. in Supp. of Summ. J. at 9 ("Def's Supp. Mem.").)

Shorter testified that he was aware of how inflammatory his e-mails and letters were, but felt that he had to write them because the courses at SCSU were not "providing [him] with the knowledge and information but [was] telling [him] that these individuals do not take people of color into consideration in terms of work." (Shorter Dep. at 1114.) His concern was that many of the techniques that were being taught in the courses were not tailored to people of color and therefore would not be effective in treating people of color. (Id.) Shorter also testified that he wrote the inflammatory e-mails and letters because he was frustrated by the fact the faculty would say that they hear and understand him but would do nothing about it. (Id. at 1119.)

## II. Incident in Peterson's Class

On October 26, 1998, Shorter was one of seventeen students enrolled in an ethics class taught by Terrance Peterson ("Peterson"). (Peterson Aff. at ¶ 3.) After Shorter had widely disseminated his September 9 and 22 memoranda and after the seven-hour faculty meeting addressing Shorter's concerns, Peterson determined that the issues raised by Shorter should be addressed openly in his ethics class. (Id. at ¶ 4.) Peterson began the discussion by asking Shorter, in front of the class, whether it was "okay" with him if the class discussed his article in the Chronicle. (Id.) Shorter testified that Peterson had previously made copies of the article and was obviously planning on having the discussion with or without Shorter's permission, so Shorter told Peterson "you were planning on doing it anyway. You already got copies to pass out." (Shorter Dep. at

1178.) Shorter also testified that Peterson introduced the class topic for that day as an ethical dilemma about an "angry black man who is Ray."[4] (Id.) The discussion that ensued dealt with Shorter's experiences at SCSU in trying to obtain his graduate degree. (Peterson Aff. ¶ 4.) According to Peterson and other students in the class, the discussion was passionate, but respectful. (Id.; Dresser-Snyder Aff. ¶ 7; Nino Aff. ¶ 7; Velsvaag Aff. ¶ 7.) After the discussion, however, Shorter refused to return to Peterson's class without an outside observer. (Id. at ¶ 5.)

As a result of Shorter's refusal, Peterson and Dean McKay allowed Shorter to bring an observer to class with him, and Shorter eventually returned to Peterson's class. (Peterson Aff. ¶ 5-6.) Shorter received an incomplete grade in the course, however, because he failed to give an in-class presentation on an ethical dilemma. (Id. at ¶ 7.) On three separate occasions Peterson made special arrangements for Shorter to make up his missed presentation and complete the class. (Id.) The first alternative presentation that Peterson arranged was to make a presentation to a group of graduate students, but Shorter objected to this proposal because Peterson had arranged for the Director of Multicultural Affairs, Les Green ("Green"), to attend the presentation. (Id.) Next, Peterson arranged for Shorter to give his presentation to a group of undergraduate students, but Shorter did

---

[4] Peterson denies making this statement. Peterson testified that when another student commented that she had trouble dealing with Shorter because he was so angry, Peterson replied "I think it will be important for you in this profession to learn to deal with angry black men." (Peterson Dep. at 45-6.)

not show up at the prearranged time. (Id.) Peterson and Dean McKay then made arrangements for Shorter to give his presentation to another group of undergraduate students, while Dean McKay was present. (Id.) Shorter completed this presentation and was given an "A" for the course. (Id.)

**III. Incident in Lesar's Class**

In the fall of 1998, David Lesar ("Lesar") taught a group process class in the Applied Psychology Department. (Lesar Aff. ¶ 2.) The purpose of the group process class was to teach future counselors to be part of a group. (Lesar Aff. Ex. A (Syllabus from 1998 Group Process class).) Shorter was one of sixteen students enrolled in the class. (Id.) The class was structured such that it required significant individual participation. (Lienemann Aff. Ex. 58 (Lesar Dep. at 21-22) ("Lesar Dep.").) In early November 1998, Shorter came into Lesar's group class about forty minutes late. (Id. at 32.) Ten minutes after Shorter arrived, Lesar had a "group-on-group" session, which involved bringing one pre-designated group of students to the center of the classroom while the other group observed the way the group members in the center group interacted. (Id. at 33.) Shorter was a member of the center group. Lesar testified that the reason he did this is that things had not been going well in Shorter's group and he wanted the group to talk about the problem. (Id.)

The discussion within the inner group centered around what it meant to be a racist and the discussion quickly became heated. (Id. at 37-9.) According to Shorter, a female

student stated that she did not feel that Shorter listened to her and that she did not want to learn about Shorter's culture from books–she wanted to learn from him. (Shorter Dep. Ex. 10.) Shorter contends that during the discussion a white student called him a racist, to which he replied "racism is White people's problem and People of Color are the victims of racism; therefore, we are not racist." (Lienemann Aff. Ex. 51 (Letter by Shorter).) Shorter stated that after he made that comment all the white students began yelling at him, saying things like "I'm sick and tired of you," "you are a racist," and "you're always blaming white people." (Id.) According to Shorter, Lesar did nothing to stop the students from saying these things and when Shorter requested that he do something, Lesar stated "what do you expect when you make a comment like that."[5] (Id.)

Shorter eventually walked out of the classroom. As he was leaving, Lesar stated "if you leave now, Ray, you can keep walking," (id.; Lesar Dep. at 44), and another student yelled to Shorter "why don't you write another letter in the Chronicle," (Shorter Dep. Ex. 10). Lesar testified that he said "keep walking" to Shorter because he was angry at Shorter for walking out of the class; however, he expected that he would come back at some point. (Id.) When it became clear that Shorter was not going to return to the class, Dean McKay spoke with Lesar and they agreed that Shorter would be invited back to Lesar's class with "no strings attached." (Id. at 46.) Lesar gave Shorter an "F" for the

[5] Lesar confirmed that the heated exchange took place between Shorter and the other students but denies making this comment to Shorter. (Lesar Dep. at 42.)

class, however, because he never returned. (Lienemann Aff. Ex. 47-48.) Months later, Shorter administratively petitioned to drop the course, which SCSU granted despite Shorter's "F" grade. (Id.) According to Dennis Nunes, the Dean of Graduate Studies at SCSU, granting this type of petition was highly unusual. (Nunes Aff. ¶ 10.) Shorter repeated the group process class the following semester by doing independent work and received an "A." (Lienemann Aff. Ex. 47-48; Nunes Aff. ¶10; Shorter Dep. 2009-10.)

After the incident in Lesar's class, Shorter sent another e-mail regarding racism at SCSU. On November 3, 1998, the same day that the students were scheduled to meet with Dean McKay and Green to discuss cultural diversity, Shorter sent an e-mail titled "My Life is in Danger!!!! Will Physical Death Be Next?" to a similar list of people as the October e-mails. (Shorter Dep. Ex. 10.) In this e-mail Shorter recounted the incident in Lesar's class and stated that he felt traumatized by the discussion and feared for his life. (Id.) He concluded his e-mail by asking "Does it have to take me being physically tortured or me being physically murdered by a White faculty or White student before this university takes these issues EXTREMELY serious." (Id.)

## IV. Shorter Receives a "C" in Career Counseling

Also in the fall of 1998, Shorter was one of forty-five students enrolled in George Petrangelo's ("Petrangelo") career counseling class. (Lienemann Aff. Ex. 57 (Petrangelo Dep. at 19) ("Petrangelo Dep.").) Petrangelo required students to attend all his classes and deducted points for nonattendance. (Petrangelo Dep. Exs. 8-9.) Shorter did not

attend a number of classes and missed some group projects–accordingly, he received a "C" in the class although his work product alone would have entitled him to a "B." (Lienemann Aff. Ex. 62 (Petrangelo's explanation of how he reached Shorter' s grade).) Shorter asserts that the reason he did not attend class was because many of the same students in Petrangelo's class had been harassing him in other classes. Shorter appealed his "C" grade and was granted a grade of "Satisfactory," which would not affect his grade point average. (Nunes Aff. ¶ 10.)

## V. Faculty's Response

In November, the applied psychology faculty canceled all classes and scheduled another faculty meeting to discuss Shorter's allegations of racism. (McKay Aff. ¶ 9.) Dean McKay also sent a memorandum to all graduate students in the Applied Psychology Department setting a time for the students to address their concerns about the program to Dean McKay and Green. (Shorter Dep. Ex. 9.) In addition to the faculty and student meetings, Dean McKay retained an outside consultant, Charles Bates, to investigate and advise SCSU regarding the allegations relating to faculty-student relations within the Applied Psychology Department. (McKay Aff. ¶ 9.) SCSU also held faculty workshops to help the faculty facilitate discussion and awareness of multicultural issues. (Id.)

## VI. Affirmative Action Investigation

In response to Shorter's October 16, 1998 e-mail, Laurel Allen ("Allen"), SCSU's Affirmative Action Officer, repeatedly attempted to contact Shorter in order to begin an

investigation into the allegations contained in the e-mail. (Allen Aff. ¶¶ 1-2.) Because Shorter never returned any of Allen's phone calls, the investigation did not proceed. (Id. at ¶ 2.) On February 2, 1999, Shorter revived Allen's investigation by filing a discrimination complaint against three SCSU professors: Peterson, Lesar, and Petrangelo.[6] (Lienemann Aff. Ex. 51 (Discrimination Complaint).) Shorter's allegations centered around the three incidents detailed above.

Allen hired two independent outside investigators, Mark Paschal ("Paschal") and Robert McDowell ("McDowell"), to look into Shorter's complaint. (Allen Aff. at ¶ 3.) Paschal had over sixteen years of experience as a government compliance officer and complaint investigator for the Office of Federal Contract Compliance Programs, and McDowell had over fifteen years of experience in conducting investigations for law firms in Minnesota. (Id.) Shorter objected to these investigators because they had been used by the SCSU in the past. Despite Shorter's objections, the investigators interviewed Shorter, sixteen students, nine faculty members, and three administrators. (Id.) Based on these interviews and the investigation, on April 19, 1999, Allen wrote an investigative report. (Id. at Ex. A.)

---

[6] During this time, Shorter sent two more e-mails, one on February 1, 1999, titled "St. Cloud State University Encourages the Lynching of a Black Man: The Spirit of Adolph Hitler is Alive in the Applied Psychology Department," (Shorter Dep. Ex. 11), and one on May 11, 1999, titled "Slave Plantation and it's Evil Slave Owners," (Shorter Dep. Ex. 19).

The report was designated as "prepared for Raymond D'Angelo Shorter" and the subjects of the investigation were Peterson, Lesar, Petrangelo, and "white student in the graduate program classes with [Shorter]." (Id.) The following conclusions were made by Allen:

> Interviews with both the professors and students (including the Complainant) of the classes revealed there were class discussions on sensitive subject matters in which participants sometimes raised their voices.
>
> There were no racial derogatory remarks or epithets made by anyone.
>
> When the administration was made aware of the complaint, a series of actions were undertaken to address the issues, which included inviting the Complainant to meet with the department. This invitation was declined.
>
> There is no dispute by anyone within the department, that more culturally sensitive information needs to be added to the current curriculum.
>
> The investigation found that steps were being taken to achieve this goal within the Applied Psychology Department.

(Allen Aff. Ex. A.) The investigative report was then forwarded to Eugene A. Gilchrist ("Gilchrist"), SCSU's Vice President for Administrative Affairs, for a final determination regarding Shorter's complaint. (Id. Ex. B (Findings of Gilchrist).) Gilchrist determined that, based on the report of the independent investigators, there was no evidence to "support the claim that Raymond Shorter was discriminated against and/or harassed by the three professors on his race." (Id.)

Gilchrist went on to write that his determination did not mean that the Applied Psychology Department could not stand to improve its diversity in faculty and students and

be more inclusive of the views of people from a more diverse set of races and cultures, and be more "sensitive to issues of diversity and social justice." (Id.) Gilchrist noted that an "apparent division" among the faculty in the department created an inability or unwillingness to communicate in matters of diversity. (Id.) According to Gilchrist, however, the obvious need for more diversity in the Applied Psychology Department and the division amongst its faculty members in these matters, did not amount to a finding of discrimination against Shorter. (Id.)

On March 30, 1999, after receiving Gilchrist's findings, Shorter filed another complaint with SCSU's Affirmative Action Office alleging retaliation by Peterson, Lesar, and Petrangelo. (Allen Aff. Ex. C.) Shorter alleged that the incomplete he received in Peterson's class was retaliatory, and that Lesar retaliated against him by talking about him and his discrimination complaint in class. (Id.) Shorter also alleged that Petrangelo retaliated against him by deducting points from his grade for lateness and absences. (Id.)

Another investigation was conducted by outside investigator McDowell. McDowell interviewed Shorter, Peterson, Lesar, and Petrangelo, reviewed prior interviews with students, and wrote another report. (Id.) The report was forwarded this time to Ali Malekzadh ("Malekzadh"), Vice President of Academic Affairs, who had been designated as the final decision-maker. (Id.) On July 15, 1999, Malekzadh determined that the information contained in the report did not support Shorter's allegations of retaliation, and dismissed the complaint. (Id.)

## VII. Mailbox Incident

In April 1999, Shorter complained to Dean McKay that he was being harassed by other students putting Christian tracts and poems in his school mailbox. The harassing items included a flyer stating "You're the One Who Can Make the Peace," a business card for a "Community Violence Prevention Specialist," a special prayer request, a verse from the Bible, a poem entitled "God Will Not be Undone," and a quote from Nelson Mandela. (Leinemann Aff. Ex. 64.) In response to Shorter's complaint, Dean McKay moved his mailbox and labeled it anonymously. (McKay Aff. ¶ 10.) Shorter did not receive any more harassing items after the move.

## VIII. Shorter's Internship Project

Shorter, as a graduate student, was required to complete a supervised counseling internship of a minimum of 600 hours before he could graduate. (McKay Aff. ¶ 11.) Shorter was responsible for finding three possible internship sites. (Id.) In May 1999, Shorter selected Anoka-Metro Regional Treatment Center as the facility for his internship. (Shorter Dep. at 2100.) The internship program required Shorter to have two supervisors, a faculty supervisor and a site supervisor. (McKay Aff. ¶ 16.) Shorter designated Bruce McNickle ("McNickle"), Director of the Anoka-Metro Regional Treatment Center, as his site supervisor and Dean McKay chose John Mason ("Mason")

as his faculty supervisor.[7] (Id. at ¶ 17.) Shorter began working for Anoka-Metro Regional Treatment Center during the 1999 summer session. Shorter registered for six internship credits and twelve credits of independent study, for a total of eighteen credits that summer. (Nunes Aff. Ex. C.) In addition, Shorter was still working forty hours a week for SCSU's Office of Multicultural Affairs. (Shorter Dep. at 1025 & 2100.)

Soon after Shorter began his internship with Anoka-Metro Regional Treatment Center, he complained to Mills-Novoa and Merchant about Mason's assignment as his faculty supervisor. (Id. at 2108.) According to Shorter, he had "racial concerns" with Mason. (Id. at 2109.) Shorter, however, could not recall why he had these racial concerns. (Id.) Initially, Dean McKay obliged and reassigned Shorter to the site supervisor, McNickle, but after discovering that the internship program required both a site supervisor and a faculty supervisor, Dean McKay reassigned Mason. (McKay Aff. ¶ 17.)

On July 20, 1999, after Shorter had completed fifty internship hours, McNickle wrote to Shorter and Mason stating that as of July 19, 1999, Shorter's internship would be terminated. (McKay Aff. Ex. E.) The reason given was that, after an extensive background check on Shorter, McNickle had been informed by the Minnesota Department of Human Services ("DHS") that Shorter was not granted permission to have

[7] Lesar was initially assigned as Shorter's faculty supervisor. Shorter objected to Lesar's assignment, however, and Dean McKay gave the assignment to Mason . (McKay Aff. ¶ 15.)

contact with patients. (Id.) McNickle determined that without patient contact Shorter would not receive the necessary internship experience and therefore terminated him from the program. (Id.) McNickle also stated that should Shorter resolve the issue with DHS he "would be very willing to re-initiate an internship with Mr. Shorter." (Id.)

SCSU investigated Shorter's disqualification and discovered that it was based on an incident that occurred a year prior to his applying to SCSU's graduate program. (Shorter Dep. Ex. 27.) Shorter was disqualified due to an arrest and charge of criminal sexual conduct in the fourth degree on September 24, 1994, in Minnesota. (Id.) Shorter had appealed the disqualification with the DHS, but his appeal had been denied, and he remained disqualified to work with patients. (Id.) Shorter was specifically disqualified from direct contact with people receiving services from facilities licensed by DHS, and from unlicenced Personal Care Provider Organizations. (Shorter Dep. Exs. 26, 27 and 28; Lienemann Aff. Exs. 30 and 31.) Shorter was temporarily suspended from the internship program while SCSU determined how to handle the situation. (McKay Aff. ¶ 20.) SCSU's attorney, Annette Wilson, recommended that SCSU determine whether there was an acceptable site for Shorter's internship, and, if there was a site, SCSU should place Shorter in the site to complete his internship as soon as possible. (McKay Aff. Ex. G.)

On September 2, 1999, Dean McKay met with Shorter and informed him that if another facility could be found that met the internship standards he would be allowed to complete his internship. (McKay Aff. ¶ 21.) On September 7, 1999, Shorter wrote Dean

McKay and complained of Mason's racist attitude toward him and that Mason talked down to him and did not listen to him. (Id. at Ex. H (Letter from Shorter to McKay).) Shorter requested that another professor be assigned as his faculty supervisor. (Id.) Dean McKay responded to Shorter's request by stating "we have accommodated you in every way in this internship, but I must inform you that it is not a student's prerogative to choose his internship supervisor. At this time, Dr. Mason will continue as your supervisor." (Id. at Ex. I (Letter from McKay to Shorter).) Dean McKay reiterated in her letter that Mason and the counseling coordinator have been informed that Shorter's internship should continue as soon as possible. (Id.)

On October 4, 1999, Dean McKay advised Shorter that an alternative site had been approved and the he could begin his internship immediately. (McKay Aff. ¶ 26.) In addition, Dean McKay informed Shorter that he would receive full credit for his internship hours at Anoka-Metro Regional Treatment Center. (Id. at ¶ 27.) Due to Shorter's racial concerns with Mason, Dean McKay attempted to schedule a meeting with Mason, Shorter, and herself, to go over the internship requirements. (Id. at ¶ 28.) Dean McKay also stressed that Shorter could not begin his internship until he met with his faculty supervisor, Mason. (Id. at Ex. J.) Shorter was reluctant to attend such a meeting.

In an October 28, 1999, memo from Shorter to Dean McKay, Shorter stated that he was being forced to "participate in an unwelcoming and hostile environment . . . [and that] Joane McKay and John Mason are trying to destroy [his] life by torturing [him]

beyond this semester." (Id. at Ex. K.) Shorter accused both Dean McKay and Mason of "using racist, evil, cruel, manipulating, devilish, and wicket methods to make [his] life miserable." (Id.) Dean McKay reported these allegations to the Minnesota State Colleges and Universities Office of Equal Opportunity and Diversity, which determined that no investigation into Shorter's allegations was necessary. (Id. at Ex. L.)

Shorter eventually completed his internship at Minnesota Community Affairs and communicated with Mason by letter regarding his progress in the internship program. (Lienemann Aff. Ex. 42.) Shorter graduated ahead of schedule from SCSU's Applied Psychology Department in December 1999. On May 25, 2000, he filed this suit asserting one claim of discrimination and hostile educational environment against SCSU in violation of 42 U.S.C. § 2000d.

## Analysis

### I. Standard of Decision

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court views evidence and the inferences which may be reasonably drawn from it in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see also Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enter. Bank, 92 F.3d at

747; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must demonstrate the existence of specific facts that create a genuine issue for trial; mere allegations or denials are not enough. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. See Liberty Lobby, 477 U.S. at 250.

The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). Essentially, the court performs the threshold inquiry of determining whether there is need for a trial. Liberty Lobby, 477 U.S. at 250.

## II. Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To assert a claim of hostile educational environment harassment under Title VI, Shorter must show that: (1) he is part of the class

of individuals protected by Title VI; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment was sufficiently severe as to alter the conditions of his education and create a hostile educational environment; and (5) SCSU had actual notice of the harassment and was deliberately indifferent to it. Waters v. Metro. State Univ., 91 F. Supp. 2d 1287, 1291 n.5 (D. Minn. 2000) (Frank, J.) (citing Kinman v. Omaha Pub. Sch. Dist. (Kinman I), 94 F.3d 463, 467 (8th Cir.1996), rev'd on other grounds, 171 F.3d 607 (8th Cir.1999) (Kinman II )); see also Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 648 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 290-91 (1998).

The parties do not dispute that Shorter is a member of the protected class, or even that he was subjected to some harassment, namely the various literature put in his school mailbox. SCSU argues, however, that any harassment by the students was based on Shorter's attitude–not his race, that the harassment was not so severe as to alter the conditions of his education and create a hostile environment. SCSU also contends that it was not deliberately indifferent to Shorter's complaints of harassment.

**A. Euro-centric Curriculum**

Shorter argues that he suffered a hostile educational environment created by a combination of the Euro-centric curriculum and the response of faculty and students to his raising concerns about it. (Pl.'s Opp'n Mem. at 20.) Shorter specifically contends that the curriculum of the Applied Psychology Graduate Program did not meet the needs

of students of color. SCSU responds that Shorter's problems with SCSU's curriculum cannot form the basis of a Title VI claim.

SCSU relies on Grimes v. Sobol, 832 F. Supp. 704 (S.D.N.Y. 1993) affirmed 37 F.3d 857 (2d Cir. 1994), for the proposition that Title VI does not extend to regulating the content of school curriculum. In Grimes, the court noted that the Title IX regulations included a provision that made a specific exemption of textbooks and curricular materials from the scope of Title IX. Id. at 711 (citing 34 C.F.R. § 106.42 (1992) ("Nothing in [Title IX] Regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials.")). The rationale given by the Department of Education for this exemption was that although "stereotyping in textbooks and curricular materials is a serious matter . . . the imposition of restrictions in this area would inevitably limit communication and would thrust the Department into the role of Federal censor." Id. (citing 40 Fed. Reg. 42128 (1975)). Accordingly, a Title IX claim stemming from the school's choice of curriculum materials is not actionable.

The Grimes court then extended this exemption to Title VI claims based on the extensive list of cases that hold that Title IX Regulations are applicable to Title VI and vice versa. See e.g. Chowdhury v. Reading Hosp. & Medical Center, 677 F.2d 317, 319 n.2 (3rd Cir. 1982), cert. denied, 463 U.S. 1229 (1983); Neighborhood Action Coalition v. City of Canton, 882 F.2d 1012, 1015 (6th Cir. 1989). The Grimes court stated that "[t]he First Amendment concerns . . . would appear equally applicable to Title VI claims

where racial discrimination is alleged." Id.; see also Gebser, 524 U.S. at 286 ("[Title IX] was modeled after Title VI of the Civil Rights Act of 1964, which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs[]; the two statutes operate in the same manner.") (citations omitted)).

The Eighth Circuit has not addressed the issue of curriculum complaints in the Title VI context. This Court, however, is persuaded by the Grimes' reasoning; specifically, its reasoning that the Department of Education's concerns with respect to preserving the First Amendment rights of institutions that receive federal aid applies equally in the Title VI context as in the Title IX. Accordingly, the Court will not consider whether the "Euro-centric" curriculum at SCSU created a hostile educational environment for Shorter.

**B. Response by Professors and Students**

Shorter also contends that the students and faculty in the Applied Psychology Department retaliated against him for complaining about the curriculum, which created a hostile educational environment. Shorter alleges that the following retaliation took place after he began complaining about the curriculum: (1) his grade in Petrangelo's class was lowered because he did not want to go to class; (2) he had to move his mailbox so as not to be inundated with religious and political statements; and (3) the faculty interfered with his ability to begin his second internship. (Pl.'s Opp'n Me. at 20.) The Court has

carefully reviewed Shorter's allegations and concludes that no reasonable jury could find these incidents of "retaliation" sufficient to create an hostile educational environment. Petrangelo testified that Shorter's grade was lowered to a "C" because he failed to attend classes, and Shorter does not dispute this. Moreover, after Shorter complained of receiving a "C," his grade was changed so as not to affect his grade point average. The harassing flyers that Shorter received in his mailbox were few and ceased as soon as his mailbox was moved and labeled anonymously. Although the interference with Shorter's mailbox is unfortunate, it does not create a hostile educational environment. Lastly, the allegation that SCSU delayed in finding Shorter a new internship site in retaliation to his complaints is without merit. Any delay was caused by Shorter's status as disqualified to work with patients and Shorter's unwillingness to work with Mason as a faculty supervisor. Accordingly, the Court concludes that Shorter has not come forth with sufficient admissible evidence to create a genuine issue of material fact that he was subjected to a hostile educational environment.[8]

**C. Deliberate Indifference**

Even if there were sufficient evidence to find that Shorter had been subjected to a hostile educational environment, he would have to produce some evidence to show that SCSU, having knowledge of the harassment, acted with deliberate indifference. Shorter

---

[8] The Court also notes that Shorter has not provided any evidence that the alleged harassment altered the conditions of his education.

has not provided any evidence of deliberate indifference. The evidence in the record before the Court overwhelmingly suggests the contrary. In response to Shorter's concerns, the SCSU faculty and administration held numerous faculty meetings to discuss multiculturalism–even canceling classes to do so, wrote a letter to Shorter stating that they understand how he feels and are trying to fix the deficiencies in the curriculum, wrote a letter to all students reminding them to be respectful of other people's beliefs, made special arrangements for Shorter to give a presentation and complete a class even after the semester had ended, allowed Shorter to bring an observer to class because he felt threatened, allowed Shorter to take a *group* process class as an *independent* study, conducted two full-scale investigations into Shorter's concerns using outside investigators, hired speakers to talk to the faculty and students about multiculturalism, moved Shorter's mailbox when he began receiving offensive literature, found a site for Shorter to complete his internship despite being disqualified from patient contact, and permitted him to take more than the maximum credits allowed to graduate earlier than his peers. The only request of Shorter's that was denied was his request to change his internship faculty supervisor–after it had already been changed once because of his complaints–this one denial pales in comparison to the steps that SCSU took in order to accommodate Shorter. Accordingly, the Court concludes that no reasonable jury, based on this evidence, could find that SCSU was deliberately indifferent to Shorter's concerns.

**Conclusion**

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 27) is **GRANTED**. Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

August 14, 2001

Richard H. Kyle
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: **AUG 14 2001**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995